Slip Op. 20-79

# UNITED STATES COURT OF INTERNATIONAL TRADE

J. CONRAD LTD,

    Plaintiff,

v.

UNITED STATES *et al.*,

    Defendants.

Ct. No. 20-00052

Before: Timothy C. Stanceu, Chief Judge, and Jennifer Choe-Groves and M. Miller Baker, Judges

METROPOLITAN STAPLE CORP.,

    Plaintiff,

v.

UNITED STATES *et al.*,

    Defendants.

Ct. No. 20-00053

## OPINION

[Plaintiffs' motions for temporary restraining orders and preliminary injunctions are denied.]

Dated: June 1, 2020

*Jeffrey Neeley*, Husch Blackwell LLP of Washington, DC, argued for Plaintiffs, *J. Conrad LTD* and *Metropolitan Staple Corp.* With him on the briefs were *Nithya Nagarajan*, *Stephen W. Brophy*, *Joseph S. Diedrich*, and *Julia B. Banegas*.

*Stephen Tosini*, Senior Trial Counsel, and *Kyle Beckrich*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of

Washington, DC, argued for Defendants. With them on the briefs were *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director.

Baker, Judge: In these twin cases, two importers of steel nails seek temporary restraining orders and preliminary injunctions against implementation or further enforcement of Presidential Proclamation 9980, which imposes tariffs on certain imported steel-derivative products, including steel nails, on national security grounds. The Court ordered consolidated briefing and heard argument for both cases together.

Based on our findings of fact and conclusions of law set out below, *see* USCIT R. 52(a)(2), we deny Plaintiffs' motions for preliminary injunctions because they have failed to demonstrate a likelihood of irreparable harm absent such relief. Given Plaintiffs' failure to carry their burden on this essential element, we need not address the other three elements required to grant preliminary injunctive relief. In view of our denial of Plaintiffs' preliminary injunction motions, we deny Plaintiffs' TRO motions as moot.

## I.    Statutory Background

These cases involve a challenge to actions taken by the President of the United States pursuant to Section 232 of the Trade Expansion Act of 1962, codified as amended at 19 U.S.C. § 1862. As its heading indicates, Section 232 authorizes the President to take certain actions to reduce imports of goods to "[s]afeguard[] national security." 19 U.S.C. § 1862.

### A.      Section 232

As relevant here, Section 232 directs that upon receipt of a request from the head of a department or agency, upon application of an interested party, or *sua sponte*, the Secretary of Commerce is to conduct an "appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request." 19 U.S.C. § 1862(b)(1)(A). The Secretary shall, "if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation." *Id.* § 1862(b)(2)(A)(iii).

The statute provides that within 270 days of commencing the investigation, the Secretary shall submit a report to the President summarizing the investigation's findings and offering recommendations for action or inaction; in addition, if the Secretary concludes the subject article's imports are in quantities or under circumstances that "threaten to impair the national security," the report shall so state. *Id.* § 1862(b)(3)(A).

If the Secretary finds a threat to national security, the President then has 90 days from his receipt of the report to determine whether he "concurs" with the Secretary's finding. *Id.* § 1862(c)(1)(A)(i). If the President concurs, he is then to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national

security." *Id.* § 1862(c)(1)(A)(ii). If the President elects to take such action, the statute provides he shall "implement" that action within 15 days after the day on which he decides to act. *Id.* § 1862(c)(1)(B).

## B.   Customs Duties

A customs duty is a tariff or tax that may be imposed, in various circumstances and for various purposes, upon imported goods entering the United States.[1] U.S. Customs and Border Protection ("Customs") is the agency that administers and enforces tariffs, including those at issue in these cases. Imported goods are subject to rates of duty, or are designated as free of duty, as set forth in the Harmonized Tariff Schedule of the United States. Most goods are subject to an "ad valorem" duty rate, which is a percentage of the merchandise's value.[2] The cases before the Court, for example, involve a controversy over a 25 percent ad valorem duty on imported steel nails. Estimated duties and fees must be deposited upon entry. *See* 19 U.S.C. § 1505(a).

An importer's liability is not fixed until the entry is "liquidated," which refers to Customs's "final computation or ascertainment of duties" owed on an

---

[1]   *See* U.S. Customs & Border Prot., *Customs Duty Information*, https://www.cbp.gov/travel/international-visitors/kbyg/customs-duty-info  (accessed May 19, 2020).

[2] U.S. Customs & Border Prot., *Importing into the United States: A Guide for Commercial Importers* at 40 (2006), https://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf.

entry of merchandise. *See* 19 C.F.R. § 159.1; *see also* 19 U.S.C. § 1500. Following liquidation, Customs either collects any additional amounts due, with interest, if the importer's deposit was lower than the final assessment or refunds any excess deposit, with interest, if the deposit was higher than the final assessment. 19 U.S.C. § 1505(b).

## II.   Factual Background

### A.   Commerce's Investigation of Steel Imports

In 2017, the Secretary of Commerce initiated a Section 232 investigation to determine the effects of steel imports on national security. *See Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel*, 82 Fed. Reg. 19,205 (Dep't Commerce Apr. 26, 2017). Following a period of investigation that included public hearings, the Secretary issued his report and recommendation to the President on January 11, 2018, within the statutory 270-day period.[3]

The Secretary found that steel is important to U.S. national security, *supra* note 3 at 2–3, that steel imports were of quantities that injured the domestic steel industry, *id.* at 3–4, that displacement of domestic steel due to

---

[3] *See generally* U.S. Dep't of Commerce, Bureau of Industry & Security, *The Effect of Imports of Steel on the National Security* (Jan. 11, 2018), https://www.bis.doc.gov/index.php/documents/steel/2224-the-effect-of-imports-of-steel-on-the-national-security-with-redactions-20180111/file.

excessive imports weakens the U.S. economy, *id.* at 4, and that global excess steel capacity further weakens the U.S. economy, *id.* at 4–5.

Based on those findings, the Secretary concluded that steel imports impaired national security for purposes of Section 232 and "that the only effective means of removing the threat of impairment is to reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity." *Id.* at 5. Accordingly, the Secretary recommended the President "take immediate action by adjusting the level of [steel] imports through quotas or tariffs … to enable U.S. steel producers to operate at an 80 percent or better average capacity utilization rate based on available capacity in 2017 … ." *Id.* at 6.

## B.    Proclamation 9705's Tariffs on Steel Products

On March 8, 2018, within 90 days of receiving the Secretary's report and recommendation, the President issued Proclamation 9705, in which he "concur[red] in the Secretary's finding that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States … ." *Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel into the United States*, ¶ 5, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018).

Proclamation 9705 imposed a 25 percent ad valorem tariff on steel articles from all countries except Canada and Mexico*, id.* ¶ 8, 83 Fed. Reg. at

11,626, and, *inter alia*, directed the Secretary to "continue to monitor imports of steel articles" and advise the President whether any further action should be taken. *Id.* cl. (5)(b), 83 Fed. Reg. at 11,628.

### C.   Proclamation 9980's Extension of Tariffs to Steel Derivative Products

On January 24, 2020, the President issued Proclamation 9980, which extended Proclamation 9705's tariffs to apply to certain steel article derivatives not previously addressed by the Secretary's report and recommendation or by Proclamation 9705. *See Proclamation 9980 of January 24, 2020, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020).[4]

The President stated that, pursuant to Proclamation 9705's instruction that the Secretary continue to monitor steel imports, the Secretary had informed him that

> imports of certain derivatives of steel articles have significantly increased since the imposition of the tariffs and quotas. The net effect of the increase of imports of these derivatives has been to erode the customer base for U.S. producers of … steel and undermine the purpose of the proclamations adjusting imports of … steel articles to remove the threatened impairment of the national security.

*Id.* ¶ 5, 85 Fed. Reg. at 5282.

---

[4] Proclamation 9980 also extended tariffs to certain aluminum article derivatives not at issue in these two cases.

Accordingly, Proclamation 9980 imposed an additional 25 percent ad valorem tariff on, *inter alia*, imported steel derivative articles (as defined in the proclamation's Annex II) with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after February 8, 2020. *Id.* cl. 1, 85 Fed. Reg. at 5283. The proclamation exempted imports of steel derivative articles from six countries. *Id.* Steel derivative articles subject to Proclamation 9980 include, but are not limited to, steel nails. *Id.* Annex II ¶ 3(ii)(B), 85 Fed. Reg. at 5291.

## D.     These Lawsuits

Plaintiffs J. Conrad LTD and Metropolitan Staple Corp. filed these two cases on March 2, 2020. They are importers and nationwide distributors of fasteners, including steel nails, not encompassed by Proclamation 9705 but encompassed by Proclamation 9980. Affidavit of Mark Buedel, ECF 10-2, at 16;[5] Affidavit of Howard Kastner, Court No. 20-53, ECF 8-2, at 16.

The defendants are the United States, the President, the U.S. Department of Commerce, the Secretary of Commerce, Customs, and the Acting Commissioner of Customs.

---

[5] As Plaintiffs' filings in these two cases are virtually identical for all relevant purposes, this opinion cites the record in Court No. 20-52 unless otherwise indicated. Citations to page numbers in the record (including the parties' briefs) refer to the pagination found in the ECF header at the top of each page.

The substantively identical complaints allege that the Secretary violated the Administrative Procedure Act in forwarding the information the President cited in Proclamation 9980 (Count I), that the President violated Section 232 by issuing Proclamation 9980 outside the statutory timetable (Count II), that the President violated Plaintiffs' Fifth Amendment due process rights by issuing Proclamation 9980 without providing notice and an opportunity for comment (Count III), that the Secretary's alleged APA violations also violated Section 232 (Count IV), and that Proclamation 9980 violated the Fifth Amendment Due Process Clause's equal protection component through disparate treatment of manufacturers and importers of steel derivatives from the exempted countries (Count V). *See* Amended Complaint, ECF 10.

### E.    The TRO and Preliminary Injunction Motions

J. Conrad moved for a TRO and preliminary injunction on March 4, 2020. ECF 23. Metropolitan Staple filed a virtually identical motion two days later. Court No. 20-53, ECF 21.

In relevant part, Plaintiffs' motions ask the Court to (1) enjoin the government from collecting cash deposits for duties imposed by Proclamation 9980 on Plaintiffs' entries filed on or after February 8, 2020, and (2) order the government to suspend liquidation of all entries of articles subject to Proclamation 9980 filed by Plaintiffs until this litigation, including any appeals, is resolved. ECF 23, at 2.

On March 10, 2020, the Court ordered consolidated briefing of the twin TRO/preliminary injunction motions, set a briefing schedule, and ordered expedited discovery. In view of the then-developing public health concerns, the Court further advised the parties to "anticipate the possibility that it may not be advisable or possible for witnesses to appear in open court and that the court may require submission of deposition testimony in lieu of live testimony. The court encourages counsel to reasonably cooperate regarding requests for expedited telephonic or videoconference depositions." ECF 31, at 5–6.

We[6] heard oral argument on Plaintiffs' TRO and preliminary injunction motions via teleconference (due to the COVID-19 pandemic) on April 7, 2020.[7] Neither side proffered either deposition or live (telephonic) witness testimony; instead, the parties relied upon the written record consisting of affidavits attached to Plaintiffs' complaints and documents produced by Plaintiffs in expedited discovery and submitted by the government in its response to Plaintiffs' motions.

---

[6] On March 12, 2020, Chief Judge Stanceu assigned these two cases to this three-judge panel. *See* 28 U.S.C. § 255(a) (authorizing the chief judge to designate a three-judge panel to hear and determine any civil action which "(1) raises an issue of the constitutionality of … a proclamation of the President …; or (2) has broad or significant implications in the administration or interpretation of the customs laws."). Chief Judge Stanceu concurrently assigned several other related cases challenging Proclamation 9980 to the same panel.

[7] The hearing was closed to the public because Plaintiffs' motions relied upon confidential business information filed under seal.

## III.   Jurisdiction

We have jurisdiction under 28 U.S.C. § 1581(i), which provides that this Court "shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(2), and "administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection …," *id.* § 1581(i)(4).

## IV.   Discussion

We begin by examining the applicable standard for issuance of a preliminary injunction. We then apply that standard as we understand it to the preliminary injunction motions pending here.

### A.   Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest." *Id.* at 20 (citing, *inter alia*, *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).

### 1.   The issue

The parties agree on the four preliminary injunction elements but disagree on how the Court should apply them. Plaintiffs contend "[a] request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." Pl. Br., ECF 32, at 16 (quoting *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1378–79 (Fed. Cir. 2009)). According to Plaintiffs, under this sliding scale approach, a party seeking a preliminary injunction need only show that it has "at least a fair chance of success on the merits." *Id.* (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)). And thus, say Plaintiffs, "[n]o one factor is 'necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others.' " Pl. Reply, ECF 48, at 7 (quoting *Belgium v. United States*, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006)).

The government, in response, argues that "plaintiffs must show that each prong of the test is 'likely,' as opposed to a balancing or sliding-scale test. Thus, if plaintiffs fail to establish any one factor by a 'clear showing,' the motion must be denied." Govt. Br., ECF 42, at 29 (citation omitted) (citing *Winter*,

555 U.S. at 20, 21, and *Mazurek*, 520 U.S. at 972). Plaintiffs contend the government misreads *Winter*, which they argue "merely reiterates how the Court must consider all four factors, which Plaintiffs do not dispute." Pl. Reply, ECF 48, at 8.

### 2.   *Winter*

The Ninth Circuit in *Winter*—applying that circuit's sliding scale test—held that a plaintiff demonstrating a "strong likelihood of success on the merits" need only show a "possibility," rather than a likelihood, of irreparable harm to obtain a preliminary injunction. *See Nat. Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 696–97 (9th Cir.), *rev'd*, 555 U.S. 7 (2008) (citing *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 906 (9th Cir. 2007)). Rejecting this dilution of the irreparable harm requirement, the Supreme Court held that "the Ninth Circuit's 'possibility standard' is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

Therefore, whatever else it may mean, *Winter* at least stands for the proposition that a showing of a *likelihood* of irreparable harm is a necessary condition for the award of preliminary injunctive relief. *Cf. D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 329 (6th Cir. 2019) (Nalbandian, J., concurring) ("If we know one thing from *Winter*, it's that a plaintiff must establish irreparable

injury."). Insofar as the sliding scale standard relaxes the necessary showing of irreparable harm to something less than a likelihood, that standard is no longer viable after *Winter*. Thus, contrary to Plaintiffs' argument that "[n]o one factor is 'necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others,' " Pl. Reply, ECF 48, at 7 (quoting *Belgium*, 452 F.3d at 1292–93), the failure to establish a likelihood of irreparable harm *is* dispositive.

Insofar as Plaintiffs rely on *Belgium* to contend that they do not need to demonstrate a likelihood of irreparable harm so long as they make a strong showing on the merits, such reliance is misplaced. That decision antedates the Supreme Court's 2008 decision in *Winter*. Moreover, *Silfab Solar* expressly reserved whether *Winter* permits relaxation of the success on the merits element under the sliding scale standard,[8] *see* 892 F.3d at 1345, which we read as an

---

[8] The question reserved by *Silfab Solar* is at the center of an unresolved circuit split. The Third and Ninth Circuits read *Winter* as not abrogating circuit precedent permitting relaxation of the likelihood of success element under the sliding scale standard when there is a strong showing of irreparable harm. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176–79 (3d Cir. 2017); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). *But see Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

The Fourth and Tenth Circuits, however, read *Winter* as precluding relaxation of any of the four preliminary injunction elements. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010) (mem.), and *adhered to in relevant part*, 607 F.3d 355, 356 (4th Cir. 2010); *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281–82 (10th Cir. 2016). The Fifth and Eleventh Circuits applied this standard prior to *Winter*. *See PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d

acknowledgment that *Winter* precludes relaxation of the irreparable harm element under that standard.

For the reasons set forth below, we conclude Plaintiffs here have failed to demonstrate a likelihood of irreparable harm. Because this failure is dispositive under *Winter*, we need not address any of the three remaining elements.

## B.   Likelihood of Irreparable Harm

Plaintiffs contend that absent a preliminary injunction, they will be irreparably harmed pending a decision on the merits by (1) payment of cash deposits for the 25 percent duties imposed by Proclamation 9980; (2) Customs's liquidation of all entries filed by them subject to Proclamation 9980; (3) the alleged deprivation of their procedural due process rights; and (4) competitive

---

535, 545 (5th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

The Second Circuit holds that its own unique balancing test survives *Winter*. *See Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–38 (2d Cir. 2010). Nevertheless, in cases where the government is the party against whom preliminary injunctive relief is sought, the Second Circuit declines for separation of powers reasons to relax the likelihood of success element even when there is a strong showing of irreparable harm. *Id.* at 35 n.4.

The Sixth, Seventh, and D.C. Circuits continue to apply various formulations of the sliding scale or balancing standard that relax the likelihood of success element when there is a strong showing of irreparable harm but have not directly confronted whether so doing is congruent with *Winter*. *See, e.g.*, *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017); *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). *But see D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 328–29 (6th Cir. 2019) (Nalbandian, J., concurring); *Davis*, 571 F.3d at 1295–96 (Kavanaugh, J., concurring); *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).

injury due to the entry of consent preliminary injunctions in related cases brought by their competitors challenging Proclamation 9980. We examine in turn each of these asserted forms of irreparable harm.

### 1.   Cash deposits

### a.   Plaintiffs' evidence

In the teleconference preliminary injunction hearing, Plaintiffs did not proffer any deposition testimony in lieu of live witness testimony as the Court invited in its order of March 10, 2020. Instead, Plaintiffs relied upon affidavits attached to their respective complaints and cited in their respective motions.[9] J. Conrad submitted an affidavit from its vice president, Mark Buedel. ECF

---

[9] "As a general rule, a preliminary injunction should not issue on the basis of affidavits alone." *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990). Insofar as this pronouncement represents Federal Circuit law for our purposes rather than merely the application of regional circuit law in a patent case— *Atari* is unclear in that regard—we read *Atari* as establishing not a *per se* rule but rather something akin to a rebuttable presumption that affidavits standing alone will not support entry of a preliminary injunction. Affidavits or their equivalent (i.e., declarations executed pursuant to 28 U.S.C. § 1746 or a verified complaint) that are detailed, non-conclusory, and non-speculative might support a preliminary injunction in an appropriate case. *See, e.g.*, *Int'l Custom Prods., Inc. v. United States*, 30 CIT 21, 28 (2006) ("A prayer for an injunction based solely on affidavits should be denied unless the affidavits attest with crystal clarity and without speculation to the imminence of real injury to the movant.") (brackets omitted) (quoting *Leland v. Morin*, 104 F. Supp. 401, 404 (S.D.N.Y. 1952)). Nevertheless, a plaintiff seeking a preliminary injunction that relies solely on affidavits does so at its peril, especially when the affiants are interested parties; the prudent practice is to proffer witness testimony subject to cross-examination, either via the submission of deposition testimony or (preferably when possible) live testimony in open court.

10-2 at 16–17.[10] Metropolitan Staple submitted an affidavit from its president,

Howard Kastner. Court No. 20-53, ECF 8-2 at 16–17.

The Buedel and Kastner affidavits are substantially identical.[11] Each affiant states (¶ 7) that his company did not anticipate the additional costs imposed by the 25 percent duties on steel nail imports. Each contends that these costs "will directly and *severely* affect our cash flow and our profitability." (Emphasis added). Each then cites his respective company's total profits in 2019 and says that

> this [anticipated] cost burden [in 2020] on a relatively small company is significant. It will require an unexpected revision of our business plans with respect to our sourcing of products covered by Proclamation 9980, and a large outflow of cash to pay the new duties.

*Id*. Each further states that he asked staff members "to analyze current orders and our projected orders and imports in 2020 to assess the impact of the duties on our future operations." ¶ 8. Based on those data showing projected imports, each offers estimated cost burdens on his company and asserts "[t]he disruption of our planned pricing and plans for quantities to be sold for the derivative steel products *make it highly unlikely that the 25% cost increase caused by the*

---

[10] J. Conrad later received leave of court to file an amended Buedel affidavit (ECF 36-1) to correct an error and resulting miscalculations.

[11] Because the specific financial data set forth in the affidavits are not relevant to our decision on the preliminary injunction motions, the citations here are to the affidavits' public versions.

*new tariffs will be able to be passed along in full to our customers.*" *Id.* (emphasis added).

These affidavits' factual assertions about Plaintiffs' ability, or inability, to pass on the tariff-induced cost increases to their customers are too conclusory to independently support any factual finding to that effect. The affidavits' factual assertions that Plaintiffs' asserted higher costs will *severely* affect cash flow and profitability are likewise too conclusory to support such a finding.

### b.    Defendants' evidence

The government's brief includes a 41-page exhibit containing documents J. Conrad produced and a 99-page exhibit containing documents Metropolitan Staple produced. Of those, the government cites ten pages of J. Conrad's materials[12] and three pages of Metropolitan Staple's. *See* Govt. Br., ECF 42, at 64 (citing ECF 40-1, at 32–41, and ECF 40-2, at 79–80, 83). In their reply, seeking to rebut the government's citations, Plaintiffs cite only one page of J. Conrad's materials and five pages of Metropolitan Staple's; in both instances, the pages are distinct from the ones the government cited. *See* Pl. Reply, ECF 48, at 27–30 (citing ECF 40-1, at 2, and ECF 40-2, at 2, 17, 56, 61, 67).

---

[12] To be clear, the government's brief cites to Bates pages JConrad00032–34 and JConrad00035–41 in Exhibit A to the government's confidential brief. Our review reveals that Bates pages 39–41 do not exist. Accordingly, we assume the page number citations are to the ".PDF pages" of Exhibit A, i.e., ECF 40-1, at 32–41.

The documents the parties cite, construed in the aggregate, show that to some unquantified degree, Plaintiffs have been able to pass on some increased costs from Proclamation 9980's cash deposits to some portion of their customer bases, while at the same time some other customers have resisted accepting Plaintiffs' price increases. Therefore, we find that Plaintiffs are likely to be forced by market pressures to absorb at least some unquantified portion of their cash deposit costs. We further find that this evidence supports Plaintiffs' assertion that their cash deposit costs will reduce their cash flow and profitability, but Plaintiffs have failed to quantify these effects or demonstrate the practical impact on their business operations resulting from these unquantified higher costs.

### c.   Analysis

### i.   *Higher costs*

Messrs. Buedel's and Kastner's self-interested assertions that the costs of paying 25 percent cash deposits on steel nail imports "likely cannot be passed along in full" to Plaintiffs' customers are at best conclusory. *See* 11A Wright & Miller, *Fed. Practice & Procedure* § 2949 (3d ed. 2014) ("All affidavits should state the facts supporting the litigant's position clearly and specifically. Preliminary injunctions [are frequently] denied if the affidavits are too vague or conclusory to demonstrate a clear right to relief under Rule 65.").

Plaintiffs' business records cited by the parties are evidence that Plaintiffs will not be able to recoup at least some portion of their increased cash deposit payments. These documents, however, do not provide context to allow us to know how many customers Plaintiffs have or how many of them cancelled orders versus seeking to negotiate, so at most the documents show that *in some cases* Plaintiffs were unable to pass on (to varying degrees) the increased costs.

More importantly, Plaintiffs have not alleged, let alone established a likelihood through the submission of evidence, that any inability to pass along their higher costs would produce business failure or other harm that could not be remedied by a refund of duties. Economic loss does not constitute irreparable harm when plaintiffs can be made whole by a money judgment at the litigation's conclusion. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough." *Id.*

On the other hand, where a plaintiff demonstrates "a viable threat of serious harm which cannot be undone," *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (emphasis removed) (quoting *S.J. Stile Assocs. v. Snyder*, 646 F.2d 522, 525 (CCPA 1981)), such harm, economic or otherwise, can constitute irreparable injury. For example, "[t]he damage award may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy."

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.). Or "[t]he nature of the plaintiff's loss may make damages very difficult to calculate." *Id.*

The record here, however, lacks any evidence to support Plaintiffs' argument that they cannot "absorb this [asserted] profit loss" resulting from cash deposit payments. Pl. Reply, ECF 48, at 28. The Buedel and Kastner affidavits make no claim that Plaintiffs' cash deposit payments threaten their respective companies' viability nor otherwise claim that Plaintiffs' reduced cash flow and profitability resulting from paying cash deposits—assertions we accept as true—will result in injury that cannot be compensated by a money judgment.

Similarly, nothing in Plaintiffs' business records cited by the parties supports the assertion that the economic cost of absorbing these higher costs is so severe that the return of cash deposits with interest at the close of this litigation—if Plaintiffs prevail—is an inadequate remedy at law. In sum, nothing on this record shows that the payment of the challenged cash deposits is likely a matter of economic life or death for Plaintiffs or likely constitutes some other severe hardship that a money judgment in due course cannot remedy.[13]

---

[13] In their reply and during the teleconference preliminary injunction hearing, Plaintiffs asserted that since they filed their preliminary injunction motions in early March, their respective economic situations had deteriorated due to the national economic effects of the COVID-19 pandemic. Although Plaintiffs' assertions regarding the pandemic's effects are plausible, they submitted no evidence to that effect and did not move for leave to do so.

As noted above, Plaintiffs argue that "Defendants' assumption that a small business like J. Conrad can simply absorb this profit loss under current conditions or pass along the 25% duties is not based on record evidence but rather on speculation." *Id.* Plaintiffs have it exactly backwards: it is *their* burden to produce "record evidence" showing at least a likelihood that they cannot "simply absorb this profit loss under current conditions"—not the government's burden to produce record evidence to rebut Plaintiffs' unsubstantiated assertions. Plaintiffs failed to carry their burden.

### ii.   *Business plan revisions*

In addition to claiming the economic harm of higher costs, the Buedel and Kastner affidavits assert that the additional duties (and hence cash deposits) imposed by Proclamation 9980 will require "unexpected revision[s] of [Plaintiffs'] business plans with respect to [their] sourcing of products covered by Proclamation 9980 … ." ECF 10-2, at 16 ¶ 7. These assertions, while relevant to the issue of likely irreparable harm, are too vague to lend significant probative weight, offering no insight into what the revisions to the business plans are. Even if presumed true, they would still be unsupported by an allegation or demonstration of how the business plan revisions likely threaten Plaintiffs' continued viability or are otherwise likely to constitute the type of economic harm that would suffice for a preliminary injunction.

* * *

For the reasons explained above, even if we presume that Plaintiffs'
higher costs likely cannot be passed along in full to their customers, that does
not suffice to establish a likelihood of irreparable harm. Plaintiffs have not
demonstrated a likelihood that absorbing some portion of the duty costs will
cause insolvency, force them to cease operations, or cause other serious harm
that could not be remedied by a money judgment at the close of this litigation.
Finally, we conclude that Messrs. Buedel's and Kastner's assertions that pay-
ment of cash deposits will require revision of Plaintiffs' business plans are too
vague to lend significant probative weight in support of a finding of likely ir-
reparable harm to Plaintiffs' viability as business enterprises.

## 2.    Liquidation of entries

Plaintiffs also seek to preliminarily enjoin Customs's liquidation of all
their entries subject to the duties imposed by Proclamation 9980. We conclude
Plaintiffs have not demonstrated a likelihood of irreparable harm should the
entries liquidate while this litigation is pending.

We understand Plaintiffs' concern that liquidation of the relevant entries
while these cases are pending, if deemed to be final and conclusive for all pur-
poses, would deny them the ultimate remedy for which they brought these ac-
tions and would thereby constitute irreparable harm. But should Plaintiffs ul-
timately prevail on the merits, any liquidations that occurred would not be-
come final and conclusive so as to prevent the Court from ordering a refund of

the 25 percent duties with interest. Defendants have expressed their agree-

ment with this conclusion. *See* Govt. Supp. Br., ECF 56, at 2.

This Court possesses "all the powers in law and equity" of a district court.

28 U.S.C. § 1585. Accordingly, with exceptions not applicable here, this Court

may award any form of relief appropriate in a civil action, *id.* § 2643(c)(1), in-

cluding, generally, a money judgment against the United States in a civil ac-

tion commenced under 28 U.S.C. § 1581. *Id.* § 2643(a)(1).

In a case such as this one, which involves neither a protestable decision

by Customs[14] nor an action arising under 19 U.S.C. § 1516a,[15] the finality of

---

[14] Customs's decisions regarding import duties involving "some sort of decision-making process," *Indus. Chems., Inc., v. United States*, 941 F.3d 1368, 1371 (Fed. Cir. 2019) (internal quotation marks and citations omitted), including, e.g., decisions regarding appraisals and classification of imported merchandise, become "final and conclusive" unless a timely protest is filed with Customs or a civil action contesting Customs's denial of such a protest is timely brought in this Court. *See* 19 U.S.C. § 1514(a). Such non-ministerial decisions by Customs are described as "protestable." *Indus. Chems.*, 941 F.3d at 1371.

Customs's execution of Proclamation 9980 by the collection of 25 percent duties in these cases is merely ministerial and hence not protestable. *See id.* ("[M]inisterial actions are not protestable under 19 U.S.C. § 1514(a).") As a result, any liquidation by Customs in these cases will not become "final and conclusive" pursuant to 19 U.S.C. § 1514(a).

[15] Under longstanding precedent, antidumping and countervailing duty cases brought under 19 U.S.C. § 1516a may become moot upon liquidation of entries due to the absence of any statutory provision allowing subsequent reliquidation if a challenge succeeds. *See Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983). A plaintiff in a case brought under 19 U.S.C. § 1516a therefore faces a likelihood of irreparable harm "because liquidation would eliminate its only available remedy: the reassessment of dumping duties in accordance with a corrected duty rate." *Agro Dutch Indus. Ltd. v. United States*, 589 F.3d 1187, 1190 (Fed. Cir. 2009) (citing

the entries' liquidation attaching according to 19 U.S.C. § 1514 is no bar to the Court's ordering appropriate relief. *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1312 (Fed. Cir. 2004) (concluding that finality under 19 U.S.C. § 1514 applies to decisions by Customs and did not preclude an order of reliquidation by the CIT in that action brought under 28 U.S.C. § 1581(i) because of the Court's grant of "broad remedial powers"); *see also Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019) (rejecting presumption that availability of *Shinyei* relief is uncertain for purposes of irreparable harm in § 1581(i) actions, and also noting estoppel effect of government's representation that such relief would potentially be available should plaintiff prevail).

For the foregoing reasons, liquidation of Plaintiffs' relevant entries prior to judgment would not constitute irreparable harm.

### 3.   Procedural injury

Plaintiffs argue that "procedural injury" can constitute irreparable harm for both APA and procedural due process purposes. Pl. Br., ECF 32, at 37–38 (citing *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1290 (CIT 2019)). Plaintiffs, however, have withdrawn their APA claim for purposes

---

*Zenith*, 710 F.2d at 810, 812). These suits do not involve antidumping or countervailing duties and therefore were not brought under 19 U.S.C. § 1516a.

Court Nos. 20-00052, -00053

Page 26

of the pending motions,[16] and *Invenergy* did not involve a procedural due process claim.

Injunctive relief for an alleged violation of procedural due process, like any other alleged legal violation, requires a showing of a likelihood of irreparable harm. *See, e.g.*, *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (affirming grant of injunctive relief for procedural due process violation because there was no adequate remedy at law for the "financial ruin" the violation was likely to cause). In other words, a procedural due process violation does not establish irreparable harm *per se*. *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 81 n.7 (1st Cir. 2009) ("The alleged denial of procedural due process, without more, does not automatically trigger a finding of irreparable harm.") (brackets and internal quotation marks omitted) (quoting *Pub. Serv. Co. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987)).

Here, Plaintiffs' own argument demonstrates why the procedural due process violation they allege—denial of the opportunity to comment upon and thus influence Proclamation 9980's tariffs on derivative steel products such as

---

[16] In their motions, Plaintiffs argued that Commerce's alleged APA violations also constitute irreparable harm. Pl. Br., ECF 32, at 37–39. In their reply, Plaintiffs withdrew their APA claim for purposes of their preliminary injunction motions. Pl. Reply, ECF 48, at 26 n.6. Plaintiffs' counsel confirmed that withdrawal in the teleconference motions hearing. As a result, we express no view on whether Plaintiffs have sufficiently demonstrated a likelihood of irreparable "procedural harm" for purposes of their APA claim.

nails that Plaintiffs import—does not likely cause irreparable injury: Plaintiffs

"suffer from ongoing harm every day *after duties are implemented* because the

ability to comment may have prevented these tariffs from being initiated by

the President under Proclamation 9980 in the first place." Pl. Br., ECF 32,

at 39 (emphasis added). As Plaintiffs implicitly acknowledge, the harm to them

is the cost of paying additional duties (in the form of cash deposits) imposed by

Proclamation 9980, not the inability to comment.

As explained above, however, Plaintiffs have not submitted any evidence

demonstrating that they have no adequate remedy at law for their economic

injury of making cash deposit payments pending the outcome of this litigation.

It is undisputed that if Plaintiffs prevail, they can recover their cash deposits

with interest, thus remedying the injury to Plaintiffs (the tariffs) resulting

from the alleged procedural due process violation (being denied the opportunity

to comment upon the steel derivative tariffs before the President imposed

them). Plaintiffs have not established a likelihood of irreparable harm for pur-

poses of their procedural due process claim.

### 4.   Competitive injury

In their reply, Plaintiffs argue for the first time that "[t]he harm to Plain-

tiffs in this case will be particularly severe, because the Court has already

granted preliminary injunctions to [three of their] competitors in parallel cases

that result in the 'irremediable competitive harm Plaintiffs are incurring

relative to other importers.'" Pl. Reply, ECF 48, at 30 (Plaintiffs' brackets omit-

ted) (quoting *Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs & Border

Prot.*, 751 F. Supp. 2d 1318, 1377 (CIT 2010)); *see also id.* at 27 ("Plaintiffs are

thus now competing against importers that have received injunctive relief and

do not have the same burden of paying the 25% tariff at issue."). Plaintiffs'

combined opening brief contains no references to this argument. Nor is this

asserted injury even mentioned, much less substantiated, in the affidavits of

Messrs. Buedel and Kastner.

   Plaintiffs' decision to wait until their reply brief to raise the "competitive

harm" theory means we cannot consider that theory. Arguments raised for the

first time in a reply brief are not properly before us except where the circum-

stances indicate adhering to that general rule would result in unfairness. *Nor-

man v. United States*, 429 F.3d 1081, 1091 n.5 (Fed. Cir. 2005). Applying that

rule here does not result in unfairness, as Plaintiffs were on notice of these

consent injunctions and had the opportunity to raise this argument in their

combined opening brief.[17] And as in *Norman*, even if Plaintiffs here had raised

---

[17] Two of the three preliminary injunctions to which Plaintiffs refer were entered by
consent prior to March 4, 2020, the date on which J. Conrad filed its preliminary
injunction motion. *See PrimeSource Bldg. Prods, Inc. v. United States*, Court No. 20-
32, ECF 40 (Feb. 13, 2020); *Oman Fasteners, LLC v. United States*, Court No. 20-37,
ECF 35 (Feb. 21, 2020). The third preliminary injunction was entered by consent on
March 4, 2020, two days prior to the date on which Metropolitan Staple filed its pre-
liminary injunction motion. *See Huttig Bldg. Prods., Inc. v. United States*, Court No.
20-45, ECF 30 (Mar. 4, 2020). Thus, Plaintiffs were on notice when they moved for

the argument in their initial motion, we would find it unconvincing because it is merely a generalized statement without any evidentiary support. *See* 429 F.3d at 1091 n.5.

## Conclusion

For the reasons stated above, we conclude Plaintiffs have failed to demonstrate a likelihood of irreparable harm absent preliminary injunctive relief. Because we read *Winter* to hold that a plaintiff must always show a likelihood of irreparable harm to obtain such relief, we must deny Plaintiffs' motions for preliminary injunctions. In doing so, we need not, and therefore do not, consider whether Plaintiffs have satisfied any of the other three elements for preliminary injunctive relief, i.e., likelihood of success on the merits, balance of the hardships, and the public interest. *Cf. Trump v. Hawaii*, 585 U.S. ___, 138 S. Ct. 2392, 2423 (2018) (citing *Winter* and declining to address other preliminary injunction elements when the plaintiff failed to establish a likelihood of success on the merits).

---

injunctive relief that certain competitors had obtained injunctions against the collection of cash deposits, but Plaintiffs chose not to address the issue in their combined opening brief and evidentiary submissions.

      Pursuant to USCIT Rule 58(a), separate interlocutory orders will issue in each of these cases **DENYING** the motions for preliminary injunctions and **DENYING** the motions for temporary restraining orders as moot.

Dated:      June 1, 2020           /s/ *Timothy C. Stanceu*
            New York, New York    Chief Judge

                                          /s/ *Jennifer Choe-Groves*
                                          Judge

                                          /s/ *M. Miller Baker*
                                          Judge